**Ray HAYS, et al., Plaintiffs,**

v.

**STATE OF LOUISIANA, et al., Defendants.**

**No. 92–CV–1522.**

United States District Court, W.D. Louisiana, Shreveport Division.

Dec. 28, 1993.

Paul L. Hurd, Monroe, LA, for plaintiffs Hays, et al.

Roy A. Mongrue, Jr., La. Dept. of Justice, Baton Rouge, LA, for defendants State of La., et al.

Before WIENER, Circuit Judge, SHAW, Chief District Judge, and WALTER, District Judge.

## MEMORANDUM OPINION

WIENER, Circuit Judge:

Plaintiffs Ray Hays, et al. (Plaintiffs) challenge the congressional redistricting plan (the Plan) adopted by the Louisiana State Legislature (the Legislature) when, following the 1990 census, it enacted Act 42 of 1992 (Act 42).[1] In its present posture, this case considers the constitutionality of the Plan, admittedly designed *inter alia* to increase the number of black representatives in Louisiana's congressional delegation from one out of eight to two out of seven. The Plaintiffs insist that the Plan accomplishes this result by employing impermissible racial gerrymandering to create a new majority-black voting

---

1. A technical distinction can be drawn between the terms "apportionment" and "reapportionment," on the one hand, and "districting" and "redistricting" on the other:

apportionment and reapportionment involve the allocation [by Congress] of a finite number of representatives among a fixed number of pre-established areas. *Districting* and *redistricting* ... refer to the process by which the lines separating legislative districts are drawn [by states].

See *Major v. Treen*, 574 F.Supp. 325, 328 (E.D.La.1983) (quoting Backstrom et al., *Issues in Gerrymandering: An Exploratory Measure of Partisan Gerrymandering Applied to Minnesota*, 62 Minn.L.Rev. 1121, 1121 n. 1 (1978). For simplicity, however, we use both terms interchangeably.

district, thereby violating the Equal Protection Clause of the United States Constitution.

In simplest form, this case poses the question, "Does a state have the *right* to create a racial majority-minority congressional district by racial gerrymandering?" In simplest form, the answer—largely supplied by the United States Supreme Court's opinion in *Shaw v. Reno*[2], rendered during the pendency of this case—is "Yes, but only if the state does it *right*."

Finding that the Plan in general and Louisiana's Congressional District 4 in particular are products of racial gerrymandering and are *not* narrowly tailored to further any compelling governmental interest, we conclude that the Legislature did not "do it right." We hold, therefore, that Plaintiffs' right to equal protection as guaranteed by the United States Constitution is violated by the Plan. Consequently, we declare Act 42 of 1992 to be unconstitutional and the redistricting plan embodied therein to be null and void; enjoin the State of Louisiana from holding any future congressional elections based on the Plan; and, although we do not invalidate the 1992 congressional elections held thereunder, hold that the term of office of each member of the United States House of Representatives from Louisiana who represents a district created under the Plan shall expire, *ipso facto*, at noon on the 3rd day of January, 1995,[3] such terms of office not to be extended or carried over into the next Congress in any manner whatsoever.

I

## STATEMENT OF THE CASE

The Plan comprises five majority-white districts (Districts 1, 3, 5, 6 & 7) and two majority-black districts (Districts 2 and 4).[4] District 2 has a minority voting age population of 56%, while District 4 has a minority voting age population of 63%. New District 2 covers essentially the same geographic area as did old District 2 in the previous plan: almost the entire population of Orleans Parish and roughly one-third of the popula-

tion of Jefferson Parish. District 2 is not challenged in the instant lawsuit, nor elsewhere to our knowledge. Rather, District 4, appearing for the first time in Act 42, is the primary focus of this constitutional challenge.

Shortly after the enactment of Act 42, the Plaintiffs filed this suit seeking to have 1) the Plan declared unlawful, 2) the Defendants enjoined from using the Plan in the impending congressional elections, 3) the Legislature ordered to create a new plan that would not segregate state residents into voting districts on the basis of race, and 4) the Defendants, preliminarily enjoined "from taking any action in preparation for the primary or general elections for the U.S. House of Representatives...." In their complaint the Plaintiffs—who are black, white, and Asian residents of either District 4 or District 5— allege that the Plan violates Section 3 of the Louisiana State Constitution, Section 2 of the Voting Rights Act, and the Fifth, Fourteenth and Fifteenth Amendments of the United States Constitution.

As required by the Voting Rights Act, the chief judge of the United States Court of Appeals for the Fifth Judicial Circuit appointed the instant panel to hear this case. It was tried on August 26 and 27, 1992 (the Trial). At the conclusion of the Trial, we issued an interlocutory Memorandum Ruling and Order (the 1992 Order) in which we denied Plaintiffs' request for an injunction, allowed the 1992 Congressional elections to go forward under the Plan, refused to consider Plaintiffs' state and federal constitutional claims, and took Plaintiffs' Voting Rights Act claims under advisement. We also requested post-trial briefing on the question whether the Plan dilutes the voting strength of either blacks or whites in contravention of the Voting Rights Act.

Being aware of an essentially identical case originating in North Carolina—now known as *Shaw v. Reno*—which had progressed further than had the instant case, we held this one under submission until the results of *Shaw* became known. On June 29, 1993, the

---

**2.** *Shaw v. Reno*, 508 U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

**3.** *See* U.S. Const. amend. XX, § 1.

**4.** *See* Table, Appendix A.

Supreme Court rendered its decision in *Shaw*, profoundly affecting this case and similar ones pending in other states. We requested the parties and invited amici curiae to file supplemental briefs, generally discussing the implications of *Shaw* and specifically addressing whether—in the terminology of *Shaw*—the Plan was "narrowly tailored to further a compelling government interest." In August 1993, we held two additional days of trial (the Evidentiary Hearing) to assist us in determining whether the Plan is in fact the product of racial gerrymandering, and, if so, whether it should nonetheless be sustained because it is narrowly tailored to further a compelling state interest.

## II

### PRELIMINARY LEGAL MATTERS

#### A. *Standing*

■ Early in this case Defendants suggested that the white Plaintiffs intrinsically lack standing to challenge the Plan. The Defendants evidently believe that only historically disadvantaged minorities have standing to attack state laws that segregate citizens on the basis of race. But that is not the case.

■ In *Shaw*, the Supreme Court reaffirmed the important principle "that equal protection analysis is not dependant on the race of those benefited or burdened by a particular classification."[5] "The guarantees of the Fourteenth Amendment extend to all persons. Its language is explicit: 'No state shall ... deny to *any person* within its jurisdiction the equal protection of the laws.' The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color. If both are not accorded the

same protection, then it is not equal."[6] White citizens thus clearly have standing to challenge redistricting plans under the Equal Protection Clause of the Fourteenth Amendment, just as do black citizens, Hispanic citizens, Asian citizens, Native American citizens, and citizens of any other race. We reject out of hand the implication that, although all are equal under the law, "some ... are more equal than others."[7]

#### B. *Survival of Plaintiffs' Equal Protection Claim*

The Defendants assert that the Plaintiffs' equal protection claim does not conform to the structure of the argument approved by the Court in *Shaw* and, consequently, that the Plaintiffs fail to state an equal protection claim under *Shaw*. The Defendants also argue that our 1992 Order, in which we denied Plaintiffs' state and federal constitutional claims, effectively disposed of the Plaintiffs' Equal Protection Clause claim with finality; and that we therefore may only consider the Plaintiffs' claim that the Plan violates the Voting Rights Act. We disagree with both of these assertions.

Although *Shaw* had not yet been decided at the time the Plaintiffs initiated the instant suit, the allegations in the Plaintiffs' complaint are clearly sufficient to make out a cognizable claim of racial gerrymandering under *Shaw*. The narrow holding of *Shaw* is that a citizen states a claim under the Equal Protection Clause by alleging that the reapportionment scheme adopted by his state is so irrational on its face, so bizarrely shaped and convoluted, "that it can only be understood as an effort to segregate voters into separate voting districts because of their race...."[8] There is no question that the

---

**5.** *Id.* 508 U.S. at ——, 113 S.Ct. at 2829, 125 L.Ed.2d at 531 (citing *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 494, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989) (internal quotations omitted).

**6.** *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 290–91, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978). Indeed, laws that entail overt racial classifications are subject to strict scrutiny, even when they burden or benefit different races equally. *See, e.g., Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). "[R]acial classifications do not become legitimate on

the assumption that all persons suffer them in equal degree." *Powers*, 499 U.S. at 410, 111 S.Ct. at 1370, 113 L.Ed.2d at 425.

**7.** George Orwell, *Animal Farm* 123 (Penguin Books 1972) (1946).

**8.** *Shaw*, 508 U.S. at ——, 113 S.Ct. at 2832, 125 L.Ed.2d at 536 (indicating that irregular shapes may imply impermissible racial gerrymandering). *See also id.* at ——— ———, 113 S.Ct. at 2826–27, 528–29.

Plaintiffs make such allegations in their complaint.

■ For example, the Plaintiffs allege that "[t]he adoption of Act 42 ... has resulted in the creation of at least two of seven districts which are devoid of any commonality of interest ... geographical compactness, contiguousness [sic], consistency with existing political, societal, governmental or economic districts or jurisdictional boundaries, other than the racial designation of the majority therein." Similarly, the plaintiffs allege that "Act 42 created two amorphous districts which embody a scheme for segregation of voters by race in order to meet a racial quota for representation of the State of Louisiana in the United States House of Representatives." And again, Plaintiffs allege that "[t]he defendants enacted and intend to implement Act 42 with the intent to create a Congressional Plan concentrating voters of a particular race in designated districts...." We find that these statements clearly amount to allegations that the State of Louisiana "adopted a reapportionment scheme so irrational on its face that it can be understood only as an effort to segregate voters into separate voting districts because of their race." [9] We conclude that the Plaintiffs have stated an Equal Protection Clause claim essentially identical to the claim alleged by the plaintiffs in *Shaw.*

Moreover, our 1992 Order, denying Plaintiffs' state and federal constitution claims, worked a temporary dismissal of Plaintiffs' equal protection claim, not a final one. It was clearly an interlocutory ruling.

In an order dated June 29, 1993 (1993 Order) we requested supplemental briefing to clarify the relevance of *Shaw* to the instant case and to appear at the Evidentiary Hearing to elucidate whether the Plan was "narrowly tailored to further a compelling government interest," as required by the Court in *Shaw.* Of necessity our 1993 Order modified our 1992 Order and reactivated the

Plaintiffs' equal protection claim in light of *Shaw.* As such a resuscitation is specifically contemplated and authorized by Rule 54(b) of the Federal Rules of Civil Procedure,[10] the Plaintiffs' equal protection claim persists and demands adjudication by this court.

## III

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

As the findings of fact and conclusions of law in this case are inextricably intertwined, we do not present them in separate sections. Such separate presentation would increase the length and redundancy of our discussion. Rather, our language will indicate whether we find a particular observation to be a finding of fact or a conclusion of law. To the extent that a finding of fact is also a conclusion of law, we adopt it as both a finding of fact and a conclusion of law. To the extent that a conclusion of law is also a finding of fact, we also embrace it as both a conclusion of law and a finding of fact.

### A. Racial Gerrymandering: General

Plaintiffs allege that the Plan is a product of racial gerrymandering. Consequently, as noted above, this case falls squarely within the ambit of *Shaw v. Reno.* In *Shaw,* the Court held that plaintiffs state a justiciable claim under the Equal Protection Clause by alleging that a redistricting scheme is "so irrational on its face that it can be understood only as an effort to segregate voters into separate voting districts because of their race....[11]" As *Shaw* was an appeal of the district court's dismissal of the plaintiffs' case for failure to state a claim, however, the Court did not have to resolve that claim; it had only to recognize it. Thus, the roadmap sketched by the Court—as helpful as it is— leaves some questions to be answered in cases such as this.

---

9. *Shaw,* 508 U.S. at ——, 113 S.Ct. at 2832, 125 L.Ed.2d at 536.

10. Rule 54(b) of the Federal Rules of Civil Procedure reads in pertinent part: "[A]ny order or other form of decision, however designated, which adjudicates fewer than all the claims ...

shall not terminate the action as to any of the claims ... and the order ... is subject to revision at any time before the entry of judgment adjudicating all the claims ..." Fed.R.Civ.P. 54(b).

11. *Shaw v. Reno,* 508 U.S. at ——, 113 S.Ct. at 2832, 125 L.Ed.2d at 536.

### 1. *Racial Gerrymandering Defined*

■ A legislature creates a racially-gerrymandered districting plan when it *intentionally* draws one or more districts along racial lines or otherwise intentionally segregates citizens into voting districts based on their race.[12] Thus, "racial gerrymandering" refers to the *intentional*, not the accidental, segregation of voters on the basis of race.[13]

### 2. *Racially Gerrymandered Plans are Subject to Strict Scrutiny*

■ The bedrock principle underlying the Court's decision in *Shaw* is that racially gerrymandered redistricting plans are subject to the same strict scrutiny that applies to other state legislation classifying citizens on the basis of race.[14] As such, racially gerrymandered plans violate the Equal Protection Clause of the Fourteenth Amendment unless

they are narrowly tailored to further a compelling governmental interest.[15]

■ Such plans receive "careful scrutiny under the Equal Protection Clause regardless of the motivations underlying their adoption." [16] This intense scrutiny is justified by the grave danger that is posed to our constitutional order and national community when a state creates and administers laws based on the race of its citizens.[17]

### 3. *Racial Gerrymandering May be Proved Either Inferentially or Directly*

■ We have already noted the narrow holding of *Shaw:* a plaintiff may state a claim under the Equal Protection Clause by alleging that the reapportionment scheme adopted by his state is so irrational on its face "that it can only be understood as an effort to segregate voters into separate vot-

**12.** *See, e.g., Wright v. Rockefeller*, 376 U.S. 52, 66–67, 84 S.Ct. 603, 610–11, 11 L.Ed.2d 512 (1964) (in which the Court examined whether the plaintiffs had sustained their burden of proving "that the New York legislature was either motivated by racial considerations or in fact drew districts on racial lines"). *See also Shaw*, 508 U.S. ——, ·113 S.Ct. 2816, 125 L.Ed.2d 511 (in which "racially gerrymandering" and "intentional segregation of voters into separate voting districts" are used interchangeably throughout).

**13.** For example, if a legislature devises a redistricting plan that separates river districts from mountain districts, and more blacks happen to live along the rivers, and more whites happen to live in the mountains, then the plan is not a product of racial gerrymandering, even though it entails some coincidental segregation. In short, *de facto* or accidental segregation is not constitutionally suspect, but state-sponsored intentional segregation is, irrespective of the legislature's underlying motives.

**14.** *Shaw v. Reno*, 508 U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511; *accord City of Mobile v. Bolden*, 446 U.S. 55, 67, 100 S.Ct. 1490, 1499, 64 L.Ed.2d 47 (1980) (indicating that claims of racial discrimination in the reapportionment context are resolved in the same way as other claims of racial discrimination); *Washington v. Davis*, 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) (referring to *Wright v. Rockefeller*, 376 U.S. at 58, 84 S.Ct. at 606, and pointing out that every member of the Court believed that plaintiffs stated a claim by alleging that "boundaries were purposefully drawn on racial lines"). In its supplemental brief to this court,

the United States (which entered this case as amicus curiae) agrees that racially gerrymandered redistricting plans must be strictly scrutinized.

**15.** *See Shaw*, 508 U.S. at ——, 113 S.Ct. at 2826, 125 L.Ed.2d at 528.

**16.** *Id.* at ——, 113 S.Ct. at 2826, 125 L.Ed.2d at 527. Thus, even if benign or benevolent motives underlie a legislature's decision to racially gerrymander a redistricting plan, that plan is still subject to strict judicial scrutiny. As discussed below, good motives may allow a plan to survive strict scrutiny, if they rise to the level of a compelling state interest, and if the plan is narrowly tailored to further such an interest. But such motives—however unspotted—do not automatically exempt the plan from what amounts to a presumption of unconstitutionality.

**17.** In *Wright v. Rockefeller*, Justice Douglas discusses the dangers of racial gerrymandering. *Wright v. Rockefeller*, 376 U.S. 52, 66–67, 84 S.Ct. 603, 610–11 (Douglas, J., dissenting) ("When racial ... lines are drawn by the State, the multiracial ... communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race ... rather than to political issues are generated; communities seek not the best representative but the best racial ... partisan."). In *Shaw*, Justice O'Connor echoes these same concerns. *Shaw*, 508 U.S. at ——, 113 S.Ct. at 2827, 125 L.Ed.2d. at 529 (Redistricting plans that segregate citizens primarily on the basis of race bear "an uncomfortable resemblance to political apartheid.").

ing districts because of their race...." [18] *Shaw* primarily deals with the problem of proving racial gerrymandering *indirectly* or *inferentially*. Racial gerrymandering—says the Court in *Shaw*—can be inferred when districts are so bizarrely shaped that they presumptively bespeak an impermissible purpose.

But racial gerrymandering may—*a fortiori*—also be proved by *direct* evidence that a legislature enacted a districting plan with the specific intent of segregating citizens into voting districts based on their race. If everyone—or nearly everyone—involved in the design and passage of a redistricting plan asserts or concedes that design of the plan was driven by race, then racial gerrymandering may be found without resorting to the inferential approach approved by the Court in *Shaw*.[19] The Court recognized in *Shaw* that "[n]o inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute." [20] The same is equally true when virtually unanimous, essentially uncontroverted *direct* trial evidence establishes racial classification, as it did here. In this case, we find overwhelming evidence—both *indirect* and *direct*—that the Plan is a product of racial gerrymandering.

### 4. *Intent Distinguished from Motive*

In a brief aside, we draw on the familiar crime of homicide as a didactic analogy to clarify the important distinction between *intent* and *motive* for purposes of this case. By definition, one who knowingly cocks, aims, and fires a loaded gun at another has the *intent* to kill or cause great bodily harm. That is the *purpose* for shooting. But the shooter may have any number of *motives* for intentionally shooting the victim: to eliminate a romantic rival; to collect insurance proceeds; to avenge some actual or perceived wrong; to repel aggression; to prevent the victim from perpetrating a crime or

misdeed; and on and on. The applicable motive is the *goal* sought to be accomplished through the *intentional* killing of the victim.

We belabor the distinction between intent and motive because it provides a more recognizable way of looking at two separate aspects of this case: 1) the *intent* of the Legislature in creating the Plan on the basis of race (racial gerrymandering); 2) the *motives* of the Legislature or of individual or groups of legislators—whether compelling or not— for engaging in racial gerrymandering. Whatever the *motivations* of the Legislature or of the individual legislators who passed the Plan, the evidence overwhelmingly indicates that the *specific intent* of the Legislature—as an independent, collective organism—was indisputably to enact a plan that included two black and five white majority districts.

At the Evidentiary Hearing so much of the testimony purporting to discuss the intent of the Legislature, or those who sought to influence Louisiana's 1992 redistricting, confounded and confused *intent* or purpose with *motive* or goal. More telling (and more candid) was the testimony at the Trial, a year earlier, concerning the *motive* for creating a second majority-black congressional district. That testimony differed markedly from its counterpart at the Evidentiary Hearing. In both proceedings the testimony on motive was considerably less uniform than was the virtually unanimous testimony regarding the Legislature's *intent* to create a second safe, black majority district. At least by implication, however, four immutable elements provided a common point of departure for all witnesses: 1) Louisiana had an unavoidable legal obligation to reapportion its congressional delegation; 2) reapportionment had to be in strict compliance with the constitutional imperative of one-person, one-vote, meaning that each of Louisiana's seven congressional

---

**18.** *Shaw*, 508 U.S. at ———, 113 S.Ct. at 2832, 125 L.Ed.2d at 536; *see id.* at ———-———, 113 S.Ct. at 2826–27, 125 L.Ed.2d at 528–29 (indicating that irregular shapes may reflect impermissible racial gerrymandering).

**19.** *See id.* at ———-———, ———, 113 S.Ct. at 2826–27, 2832, 125 L.Ed.2d at 528–29, 536 (regardless of how a racial gerrymander is created, it should

receive strict scrutiny); *accord City of Mobile v. Bolden*, 446 U.S. 55, 67, 100 S.Ct. 1490, 1499, 64 L.Ed.2d 47 (1980).

**20.** 508 U.S. at ———, 113 S.Ct. at 2824, 125 L.Ed.2d at 525 (citing *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979)).

districts had to contain roughly 603,000 residents; 3) given its failure to adopt a reapportionment plan in 1991, the Legislature would have to adopt a plan in its 1992 session that would be certain to receive immediate preclearance so that the congressional election, scheduled for the fall of that year, could be held; and 4) to obtain timely preclearance, i.e., voluntarily and not by court decree, any plan would have to include two safe, black majority districts.[21]

**21.** Even though the Legislature put itself under severe time constraints by failing to redistrict in 1991, the United States Department of Justice—not a party to this litigation—must be regarded as an active player in this case. As Louisiana is covered by Section 5 of the Voting Rights Act, the Legislature must either (1) have any proposed plan precleared by the Department of Justice, or (2) seek a judgment from the United States District Court for the District of Columbia declaring that the plan "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color...." Voting Rights Act of 1965, 42 U.S.C. § 1973c. The testimony at the Trial and at the Evidentiary Hearing reflected overwhelmingly that the Attorney General's Office (AGO) had let it be known that preclearance would not be forthcoming for any plan that did not include at least *two* "safe" black districts out of seven. But neither Section 2, nor Section 5 of the Voting Rights Act justifies the AGO's insistence upon two black districts.

To challenge a redistricting plan under Section 2 successfully, plaintiffs who are members of a cognizable racial group must demonstrate that their group is *numerous* enough and *geographically compact* enough to be a majority in a district. *Growe v. Emison,* 507 U.S. ——, ——, 113 S.Ct. 1075, 1083, 122 L.Ed.2d 388, 403 (1993) (extending the threshold requirements elaborated in *Thornburg v. Gingles,* 478 U.S. 30, 46–47, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986), to single member, as well as multimember, districts). Obviously, however, black voters in District 4 do not constitute a *geographically compact* body as required by *Gingles.* Neither would any district resembling District 4 be geographically compact. Consequently, the AGO cannot legitimately claim that Section 2 of the Voting Rights Act compels the creation of any redistricting plan that contains a tortured district like District 4. Unless a second geographically compact black majority district is possible, the State's failure to create one does not violate Section 2. *Growe,* 507 U.S. at —— ——, 113 S.Ct. at 1084–85, 122 L.Ed.2d at 404. This is not to say that Section 2 forbids the creation of such a plan; simply that Section 2 does not require it. *Voinovich v. Quilter,* 507 U.S. ——, —— – ——, 113 S.Ct. 1149, 1156–58, 122 L.Ed.2d 500, 513–14 (1993). Consequently, the AGO cannot rely on Section 2 of the Voting Rights Act to force a state to adopt a plan containing an additional majority-minority district with a geographically dispersed black majority.

Additionally, Section 2 of the Voting Rights Act expressly states that "[n]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." Voting Rights Act of 1965, Section 2, 42 U.S.C. § 1973. Section 2 refuses to transform the individual right to vote into a group right to elect. Thus, Section 2 emphatically does not authorize the AGO to reject plans that fail to "give full effect" to minority voters, or otherwise to create a *de facto* requirement of proportional representation by rejecting all plans that fail to maximize the concentration of minority voters. The text of Section 2 of the Voting Rights Act expressly declares that proportional representation is not required.

Neither can Section 5 of the Voting Rights Act—on the basis of the 1990 Census—justify the AGO's insistence that Louisiana adopt a congressional redistricting plan with two safe, black-majority districts. In *Beer v. United States,* the Supreme Court stated that "the purpose of Section 5 has always been to insure that no voting-procedure changes would be made that would lead to a *retrogression* in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1976) (emphasis added); *accord Shaw,* 508 U.S. at ——, 113 S.Ct. at 2830, 125 L.Ed.2d at 533. In this case, however, a redistricting Plan for the State of Louisiana that provided for one black majority district would have satisfied the requirement of nonretrogression.

As a result of the 1990 Census, Louisiana lost a seat in the United States House of Representatives: previously it had eight seats, now it has seven. Thus, even if the Legislature had adopted a plan with a single black majority district, that plan would have satisfied the Section 5 nonretrogression principle: whereas before black majority districts comprised one-eighth of all districts, under a new plan with one black majority district, such districts would constitute one-seventh of all districts, an increase of nearly two percent. Thus, the Section 5 nonretrogression principle does not, on the instant facts, require Louisiana to adopt a redistricting plan with a second black-majority district. Any suggestion by the AGO to the contrary was incorrect.

In summary, neither Section 2 nor Section 5 of the Voting Rights Act justify the AGO's insistence that Louisiana adopt a plan with two safe, black majority districts. Yet members of the Legislature uniformly believed that they needed to create such a redistricting plan to secure preclearance. The letters sent by the Office of the Assistant Attorney General (AAGO) in response to redistricting plans for the Louisiana Senate and the Board of Elementary and Secondary Education (BESE) show how Louisiana legislators got this mistaken impression.

In these letters, the AAGO acknowledged that the plans "appear[ed] to have no retrogressive

## B. *Shaw v. Reno: Inferential Proof of Racial Gerrymandering*

*Shaw* deals primarily with proving racial gerrymandering *inferentially.* We proceed to examine the indirect or circumstantial evidence of racial gerrymandering in the instant case.

### 1. *The Shifting Evidentiary Burden*

■ The Court in *Shaw* apparently intended to establish an evidentiary "minuet"

effect" and met "in large part ... Section 5 preclearance requirements." Yet the AAGO refused to preclear the plans because—in its apparent judgment—they could have been drawn "in a manner that would more effectively provide to black voters an equal opportunity ... to elect candidates of their choice," there a euphemism for black candidates. But, again, the Voting Rights Act does not require that a plan be drawn to maximize the efficacy of the black vote, and we perceive the AAGO's insistence upon such a result to be tantamount to an insistence upon proportional representation: an insistence that is expressly forbidden by Section 2 of the Voting Rights Act.

In one letter the AAGO went so far as to suggest *how* the plan should be drawn to secure early preclearance by combining "significant concentrations of black voters in northeastern Louisiana and in the parishes bordering the State of Mississippi, both along the river and the state's southern border." Here—in a nutshell—was a blueprint for the highly irregular district known as District 4: a district that runs through the length and breadth of the State, a district that ignores traditional geographical and political boundaries, yet a district that the AAGO inappropriately hinted would have to be created if Louisiana was to secure preclearance. What was the authority for the AAGO's insistence? The answer presents itself: none.

When State authorities wrote back, explaining the historical, cultural, political, economic, and religious significance of the north-south divide in Louisiana, as a means of explaining and defending its proposed plan, the AAGO dismissed the explanation and concluded that lumping black voters together in a district "transcends the distinction between northern and southern parishes." What was the authority for this judgment: again, none! To reiterate, neither Section 2 nor Section 5 of the Voting Rights Act requires that geographically dispersed black voters be lumped together to maximize the efficacy of their vote. That is nothing more than an AAGO "gloss" on the Voting Rights Act—a gloss unapproved by Congress and unsanctioned by the courts.

The Department of Justice did not conclude that Louisiana's concern with preserving its historic parishes was pretextual; it *decided* that creating black districts trumped traditional redistricting criteria. What was the authority for this policy decision? Yet again, none! As the AAGO

for racial gerrymandering cases analogous to the one established by *McDonnell Douglas v. Green* and *Texas Department of Community Affairs v. Burdine* in the Title VII context.[22] After a citizen establishes a cause of action by alleging that the reapportionment scheme adopted by his state is so irrational on its face that it can only be understood as an effort to segregate voters on the basis of race—thereby creating a presumption of un-

concluded that the State BESE plan was not retrogressive with respect to the black vote, it necessarily admitted that the plan had no discriminatory effect. *See Beer v. United States*, 425 U.S. 130, 140, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629, 639. Thus, the AAGO could legally reject the plan only if it determined—and presumably for non-arbitrary reasons—that the plan reflected discriminatory motives. *Georgia v. United States*, 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973). But the AAGO did not so conclude.

Rather, the AAGO arrogated the power to use Section 5 preclearance as a sword to implement forcibly its own redistricting policies, rather than as a shield to prevent lamentable historical abuses. The Attorney General's Office has no authority to withhold preclearance for reasons outside the ambit of the Voting Rights Act. Indeed, because any plan that entails more racial gerrymandering than is absolutely necessary to pass Voting Rights Act muster is potentially unconstitutional, *Shaw*, 508 U.S. at ——, 113 S.Ct. at 2831, 125 L.Ed.2d at 534, the AGO will risk encouraging unconstitutional conduct if it pressures states to gerrymander their districts to maximize the concentration of minority voters.

**22.** *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The three-step McDonnell–Douglas–Burdine "minuet" structures the basic allocation of burdens and order of presentation of proof in the Title VII context. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093. This minuet requires (1) the plaintiff to prove—by a preponderance of the evidence—a prima facie case of disparate treatment that contravenes Title VII of the Civil Rights Act of 1964, (2) the defendant to proffer a legitimate, nondiscriminatory reason for the employee's rejection, and (3) the plaintiff to demonstrate that the defendant's proffered explanation is pretextual. *Id.* at 253, 101 S.Ct. at 1093. At the end of the day, however, the plaintiff has the burden of proving that a violation of Title VII occurred. *See St. Mary's Honor Center v. Hicks*, 509 U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

constitutionality[23]—the burden shifts to the state to proffer a legitimate, non-racial explanation for the irrationally shaped districts in its plan.[24] If, per chance, the state should answer, generally denying gerrymandering, and move for summary judgment, the plaintiff presumably would need to support such a presumption with summary judgment evidence, e.g., affidavits and depositions demonstrating legislative intent, violation of redistricting principles, or the like. But if the state advances a legitimate, non-racial explanation for the plan's irregularity, then the factfinder must—as always—weigh the evidence on both sides and decide whether the plaintiff has met his burden of demonstrating that the plan's irrational shape reflects racial gerrymandering.[25]

■ Although the Court in *Shaw* does not discuss the respective burdens borne by the parties in this shifting protocol, Supreme Court precedent clearly indicates that plaintiffs have the ultimate burden of proving—by a preponderance of the evidence—that the irregularity of the challenged districts reflects racial gerrymandering.[26] Proof on the merits would likely focus on the pretext of

the state's proffered non-discriminatory reasons. Nevertheless, placing the burden of proof on the plaintiffs reflects a basic tenet of equal protection analysis: there can be no violation of the Equal Protection Clause unless those who complain demonstrate that the state has engaged in purposeful discrimination.[27] Thus, in this case, Plaintiffs have the burden of demonstrating by a preponderance of the evidence that the Legislature was "motivated by racial considerations" when it adopted Act 42.[28] We find that the plaintiffs have met that burden—comfortably.

### 2. *Plaintiffs' Cause of Action*

■ In addition to stating a cause of action by alleging extreme irregularity of shape, a plaintiff may, under *Shaw*, strengthen the inference that the state engaged in constitutionally suspect racial gerrymandering by demonstrating the state's disregard of traditional districting principles.[29] As discussed above in section II B, the Plaintiffs have clearly alleged both that the Plan—particularly District 4—is highly irregular on its face, and that the Plan disregards traditional districting principles.[30] We therefore conclude that the Plaintiffs established a

23. *Shaw*, 508 U.S. at ——, 113 S.Ct. at 2832, 125 L.Ed.2d at 536; *See also id.* at ——–——, 113 S.Ct. at 2826–27, 125 L.Ed.2d at 528–29 (indicating that irregular shapes may imply impermissible racial gerrymandering).

24. *Id.*

25. *See, e.g., Wright*, 376 U.S. 52, 84 S.Ct. 603 (in which the Court held that the plaintiffs had not "sustained their burden of proving that ... [the plan] ... segregates eligible voters by race and place of origin in violation of the Equal Protection and Due Process Clauses...."); *accord Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). To clarify this minuet further, if a plaintiff comes into court with a map bearing hideously contorted districts and evidence that the state legislature drew those districts on the basis of race, and if the plaintiff complains that those districts lack a non-racial explanation—i.e., cannot be explained or understood without hypothesizing racial gerrymandering—then the plaintiff has stated a prima facie case under *Shaw*. If the state then introduces evidence that tends to show that the legislature was actuated by other motives that can explain the bizarre contours of the districts without resorting to race, the state has created a competing inference. The factfinder must then decide, on the basis of all available evidence, who is right.

26. *Id.*

27. *City of Mobile v. Bolden*, 446 U.S. 55, 66, 100 S.Ct. 1490, 1499, 64 L.Ed.2d 47 (1980) (citing *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)); Plaintiffs also have the burden of proving the invalidity of a reapportionment plan under Section 2 of the Voting Rights Act. *Voinovich v. Quilter*, 507 U.S. ——, ——, 113 S.Ct. 1149, 1156, 122 L.Ed.2d 500, 512 (1993).

28. *Wright*, 376 U.S. at 55, 84 S.Ct. at 604.

29. *Shaw*, 508 U.S. at ——, 113 S.Ct. at 2826, 125 L.Ed.2d at 528.

30. For example, Plaintiffs allege that "[t]he adoption of Act 42 ... has resulted in the creation of at least two of seven districts which are devoid of any commonality of interest ... geographical compactness, contiguousness [sic], consistency with existing political, societal, governmental or economic districts or jurisdictional boundaries, other than the racial designation of the majority therein." *See* discussion in section II B of this Memorandum Opinion for other examples of Plaintiffs' allegations.

cause of action essentially identical to that alleged by the plaintiffs in *Shaw.* It consequently devolved upon the Defendants either to refute the allegations directly or to provide legitimate, non-racial explanations for the Plan's irrational shape and its disregard of traditional districting criteria.[31]

### 3. *Defendants' Proffered Justifications*

Apparently recognizing the impossibility of directly refuting high irregularity and violation of traditional districting criteria, the Defendants attempted to justify the Plan. During the entire Trial, not one witness ever suggested that the Legislature's *intent* in creating District 4 was anything other than to create a second district with a supermajority of black voters by drawing its boundaries along racial lines. Indeed, most of the testimony of the Defendants' witnesses concerned how numerically large a black majority was needed to ensure the effectiveness of the Plan, which everyone conceded to be a product of racial gerrymandering.

At the Evidentiary Hearing, however, following as it did on the heels of the Supreme Court's decision in *Shaw,* the Defendants—with the benefit of hindsight—attempted to deny the racial gerrymandering that they so candidly proclaimed and avidly defended a year earlier at the Trial. Specifically, the Defendants now suggest that two non-racial factors played key roles in the creation of the Plan: partisan/incumbent politics and socioeconomic commonalities. As discussed in the following section, we find the Defendants' explanations wholly unconvincing and in many respects disingenuous.

### 4. *Choosing Between the Competing Inferences*

Because of the procedural posture of *Shaw,* the Court did not have to go beyond reversing the district court's grant of the defendants' motion to dismiss. Following a full merits trial here, however, we are obliged to decide whether the Plaintiffs have carried their burden of proving—by a preponderance of the evidence—that the Plan's irregularity and its disregard of traditional redistricting principles reflect racial gerrymandering. As we find that the *only sensible* explanation for the Plan's extreme facial irregularity and its flagrant deviation from traditional districting criteria is that the Legislature intentionally segregated voters into congressional districts based on their race, we conclude that the Plaintiffs have overwhelmingly satisfied their burden of proving racial gerrymandering.

### a. *Plaintiffs' Inferential Evidence*
#### 1. *The Plan is Highly Irregular*

The most cursory inspection of the districts established by Act 42 reveals several of them to be irregular, and District 4 to be highly irregular.[32] Like the fictional swordsman Zorro, when making his signature mark, District 4 slashes a giant but somewhat shaky "Z" across the state, as it cuts a swath through much of Louisiana.[33] It begins north of Shreveport—in the northwestern corner of Louisiana, just east of the Texas border and flush against the Arkansas border—and sweeps east along that border, periodically extending pseudopods southward to engulf small pockets of black voters, all the way to the Mississippi River. The district then turns south and meanders down the west bank of the Mississippi River in a narrow band, gobbling up more and more black voters as it goes. As it nears Baton Rouge, the district juts abruptly east to swallow predominantly black portions of several more parishes. Simultaneously, it hooks in a northwesterly arc, appropriating still more black voters on its way to Alexandria, where it selectively includes only predominantly black residential neighborhoods. Finally, at its southern extremity, the district extends yet another projection—this one westward

---

**31.** Recalling our pedagogic comparison with homicide, when the state attempts to convict a defendant of homicide using circumstantial evidence—essentially arguing that the facts are consistent with homicide, the defendant may attempt to show that the evidence is consistent with a far more innocent hypothesis: for example, an accident. The Defendants' opportunity, to provide legitimate, non-racial explanations for the Plan's irrational shape is analogous.

**32.** *See* Map, Appendix B.

**33.** *Id.*

towards Lafayette—adding still more concentrations of black residents. On the basis of District 4's physiognomy alone, the Plan is thus highly irregular, suggesting strongly that the Legislature engaged in racial gerrymandering.[34]

### 2. The Plan Violates Traditional Redistricting Principles

In *Shaw*, the Court reiterates the notion that states are not constitutionally *required* to adhere to the traditional redistricting principles of compactness, contiguity, respect for established political subdivisions, and commonality of interests.[35] The Court also observes that a state's *adherence* to traditional districting criteria "may serve to defeat a claim that a district has been gerrymandered on racial lines."[36] Yet a state's *disregard* of such criteria, emphasizes the *Shaw* opinion, may be evidence of constitutionally-suspect racial gerrymandering.[37]

Indeed, the Court in *Shaw* refers to a situation "in which a State concentrated a dispersed minority population in a single district by disregarding traditional districting principles ..." as a circumstance in which racial gerrymandering can be easily inferred, precisely because the state ignored such principles.[38] As a state's decision to disregard traditional redistricting criteria is probative of constitutionally-suspect racial gerrymandering, we closely examine the Plan's adherence (or, more accurately, non-adherence) to those principles; and we find that, for the most part, the Plan cavalierly disregards them.

### a. Compactness

District 4 snakes narrowly across Louisiana soil from end to end for more than 600 miles.[39] A rectangle superimposed on the Z-shaped figure formed by District 4 would overlay two-thirds of the State. Additionally, as it winds along its erratic path, District 4 projects myriad diverticulae to encapsulate small sacs of otherwise widely dispersed black voters. No one could claim that District 4 is compact, at least not with a straight face.

### b. Contiguity

District 4 was confected to satisfy the traditional districting criterion of contiguity, but only hypertechnically and thus cynically. When displayed on a map of the State, the district's boundaries seem several times to narrow to a single point. This impression reflects reality, for at some places along its attenuated path, District 4 is no more than 80 feet wide. Such tokenism mocks the traditional criterion of contiguity.[40]

### c. Respect For Political Subdivisions

As one witness explained at the Evidentiary Hearing, there is no more fundamental unit of societal organization in the history of Louisiana than the parish.[41] Whereas the previous congressional plan divided only seven of modern Louisiana's 64 parishes, scattering fractions of the same parish in more than one congressional district, Act 42 splits and scatters 28. District 4 is particularly aggressive in violating the boundaries of these traditional political and governmental units of the State: of the 28 parishes touched by District 4, only four whole parishes are included; but the district annexes only

---

**34.** *See generally Shaw*, 508 U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511.

**35.** *Shaw*, 508 U.S. at —— – ——, 113 S.Ct. at 2826–27, 125 L.Ed.2d at 528–29 (citing *Gaffney v. Cummings*, 412 U.S. 735, 752, n. 18, 93 S.Ct. 2321, 2331, n. 18, 37 L.Ed.2d 298 (1973)). The seminal case of *Major v. Treen* also discusses these traditional redistricting criteria and applies them to the Louisiana context. *Major v. Treen*, 574 F.Supp. 325 (E.D.La.1983).

**36.** *Id.* 508 U.S. at ——, 113 S.Ct. at 2827, 125 L.Ed.2d at 529 (citing *Karcher v. Daggett*, 462 U.S. 725, 755, 103 S.Ct. 2653, 2672, 77 L.Ed.2d 133 (1983)).

**37.** *Id.* at ——, 113 S.Ct. at 2826, 125 L.Ed.2d at 528.

**38.** *Id.*

**39.** *See* Map, Appendix B.

**40.** In complementary fashion, District 6 maintains contiguity only by employing gossamer connections at several junctions.

**41.** A parish is analogous to a county, but it has its roots in, and takes its name from, the ministrations of the Catholic Church in early Louisiana history.

shards of 24 additional parishes, usually incorporating none but the predominantly black fragments of those shattered regions. Additionally, for the first time in Louisiana history, with the advent of Act 42 a districting plan violates the boundaries of nearly all major municipalities in the State. With the exception of Lake Charles, the Plan fragments all major municipalities into more than one congressional district, thereby destroying the common representation historically enjoyed by residents of the same municipality.[42]

#### d. Commonality of Interests

Within its irregular boundaries, District 4 subsumes bits of every religious, ethnic, economic, social, and topographical type found in Louisiana.

##### (i) Religion and Ethnicity

District 4 violates the traditional north-south ethno-religious division of the State. Along its circuitous route, this new district combines English–Scotch–Irish, mainline Protestants, traditional rural black Protestants, South Louisiana black Catholics, Continental French–Spanish–German Roman Catholics, sui generic Creoles, and thoroughly mixed polyglots, each from an historically discrete and distinctive region of Louisiana, as never heretofore so extensively agglomerated.

##### (ii) Economic Base

Cotton and soybean plantations, centers of petrochemical production, urban manufacturing complexes, timberlands, saw mills and paper mills, river barge depots, and rice and sugarcane fields are strung together to form the eclectic and incoherent industrial base of District 4. These diverse segments of the State economy have little in common. Indeed, their interests more often conflict than harmonize.

##### (iii) Geography and Topography

Red clay hills and pinelands, hardwood bottomlands and forests, alluvial floodlands, coastal plains, marshes, swamps and wetlands—all are present in District 4, which—as noted above—stretches more than half a thousand miles from end to end. What did the Legislature intend when it created District 4—this non-traditional, little-in-common "un-district"? The indirect evidence overwhelmingly indicates that the Legislature specifically intended to create a plan with at least two majority black districts. Given the pre-existence of District 2, we find beyond cavil that the Legislature accomplished this by parceling voters into the remaining six districts on the basis of race.

#### b. Defendants' Counter-Proof

In contrast, we have been shown no credible evidence supporting the defense witnesses' proffered motivations of party and incumbency protection and socioeconomic commonality. Their explanations ring hollow. We find them to be no more than disingenuous, *post hoc* rationalizations.

In particular, we find that neither partisan nor incumbency politics was a significant factor in the core decision intentionally to create a plan containing a second black majority district. At the Trial, the Defendants never suggested that partisan or incumbent politics played a role in the determination to create District 4.[43] Indeed, Defendants' counsel objected to Plaintiffs' counsel's questions aimed at eliciting testimony about the Black Cau-

---

**42.** Disregarding New Orleans, which comprises the majority of District 2, the major municipalities of Shreveport, Baton Rouge, Lafayette, Monroe, Alexandria, and Ruston are all rent asunder in this manner.

**43.** At the Evidentiary Hearing, Defendants introduced evidence of the role of incumbency, but it proved irrelevant to the issue of intentional segregation of voters by race. Such evidence showed, at most, that incumbency affected only the general location of the gerrymander that is District 4, i.e., the effective efforts of Congressional incumbents in "pushing" the pre-ordained second black majority district generally as far north and east as possible. Thus it follows largely the northern boundary of Louisiana with Arkansas and the eastern boundary of Louisiana, i.e., the Mississippi River. But, as Louisiana had already lost one of its eight seats in the House of Representatives, creating a game of incumbents' "musical chairs," none should be surprised by the interesting but irrelevant fact that, once the decision to create a second minority-majority district had been made, each incumbent did what he could to keep his traditional geographical base and see that the new district was located anywhere but in his.

cus–Republican Caucus alliance that supported Act 42, arguing that such testimony was political and therefore irrelevant to the case. Moreover, even though party and incumbency protection play some role—large or small—in virtually everything done in the legislative branches (and executive branches, for that matter) of our contemporary governments, this universal truism does not negate the compelling inference that Act 42 in general, and District 4 in particular, are products of racial gerrymandering. Additionally, without for a moment granting that incumbency politics played a significant role in the decision to create a second majority black district, we question whether the Defendants could prevail in this litigation even if it had.

■ The Defendants seem to believe that they can defeat a claim of racial gerrymandering under *Shaw* if *any* factor other than race played *any* cognizable role in the creation of a challenged redistricting plan. Although we need not correct such a misconstruction of *Shaw* to find racial gerrymandering in this case, we briefly address this legal issue—*obiter dictum*—in hopes of shedding a little additional light on this difficult area of the law.

The Defendants evidently base their belief—that the presence of any non-racial motivating factor will excuse racial gerrymandering—on language found at the end of the *Shaw* opinion. There the Court indicates that a plaintiff *states a claim* under the Equal Protection Clause by alleging that a reapportionment plan is so irrational on its face "that it can be understood *only* as an effort to segregate voters...."[44] This emphatically does not mean that if any other factor influenced the legislature the plaintiff is unable to establish a racial gerrymander. Rather, it means that if the contours and content of a redistricting plan *can* be wholly explained to be the product of one or more factors other than race, then the defendants have created a competing inference. The court must then weigh the competing inferences—as indeed it usually must—to decide whether the plaintiff has proved his inference by a preponderance of the evidence.[45] Thus, accurately stated, the question posed by *Shaw* is whether a redistricting plan can be reasonably conceived as the product of non-racial factors. In this case the Plan cannot.[46]

■ No one claims that the contours of District 4 can be wholly and alternately explained as a product of partisan or incumbency politics. Every single witness who addressed the issue either proclaimed or acknowledged that the creation of a second black majority district was the primary factor—or at least a substantial and important factor—in the creation of the Plan. We agree. There is no way that a rational factfinder—looking at the map and reviewing the *credible* evidence with care—could conclude that Act 42 can be explained entirely without reference to racial gerrymandering.

**44.** *Shaw,* 508 U.S. at ——, 113 S.Ct. at 2832, 125 L.Ed.2d at 536 (emphasis added).

**45.** *Wright v. Rockefeller,* 376 U.S. 52, 57, 84 S.Ct. 603, 605, 11 L.Ed.2d 512 (1964).

**46.** At the risk of flaying a dead horse, we point out that logic demands that the Defendants' reading of *Shaw* be rejected. Suppose a state legislature came right out and admitted that it racially gerrymandered districts in a reapportionment plan, thereby obviating the plaintiff's need to show racial gerrymandering inferentially. Could the state then say, "but we also drew a few district lines to protect incumbents, or to follow a river, or to put a state wildlife park in the district of a congressman who likes migratory birds," and thereby defeat plaintiff's claim because race *was not the only factor* involved in the delineation of districts? Race will never be literally the only factor. So *Shaw* requires only that race be an important factor. If the plaintiff's evidence shows that the plan cannot be understood without postulating that the legislature was significantly actuated by racial motives, then the plaintiff has made out a case of racial gerrymandering.

The cases of *Wright v. Rockefeller* and *Arlington Heights v. Metropolitan Hous. Dev. Corp.* support this interpretation. In *Wright* every member of the court accepted that the plaintiffs stated a claim by alleging that the "New York Legislature was *either motivated by racial considerations,* or in fact drew the districts on racial lines." 376 U.S. at 54, 84 S.Ct. at 604. Similarly, the Court in *Arlington Heights* noted that invidious discriminatory intent need not be the legislature's dominant purpose: proof that such discriminatory intent was "a motivating factor" in the legislation is sufficient. 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

At the Evidentiary Hearing, Dr. Alan Lichtman, an expert witness for the Defendants, opined that District 4—which appears so violative of traditional redistricting principles—actually possesses socioeconomic commonality and coherence. Dr. Lichtman contended that District 4 was distinguishable from other districts because its residents were relatively poor, relatively under-educated, and owned fewer telephones and automobiles than did the residents of other districts established by the Plan. The Defendants offered this evidence to suggest "a rational basis [for District 4] other than race." [47] We do not gainsay the conclusions of this witness, but we disagree that they have significance.

Any able statistician who looks at enough statistical characteristics (multivariate analysis) can find something distinctive about any district. In this case District 4 was found to be fairly poor, although poverty is not particularly distinctive in any region of Louisiana. Had District 4 been a fairly wealthy district, the Defendants' expert could have opined that the citizens of District 4 shared the common interest of wealth. And had District 4 fallen right in the middle, he could have explained that District 4 was distinctive in being the most solidly middle class. But all these observations are irrelevant because we find them to rise to no level higher than *post hoc* rationalization.[48]

The Defendants admit that the socioeconomic profiles of the Plan's districts were not *actually* used by the Legislature: the census data used in Defendants' statistical analyses were not even available to the Legislature when it passed Act 42. More specifically, freshman Louisiana State Senator Tom Greene testified that no socioeconomic data was submitted with the various redistricting plans when they were considered by the Legislature. Thus, the allegedly distinctive socioeconomic profile of District 4 is factually unconvincing, methodologically flawed, irrelevant, and unquestionably a hindsight rationalization of a plan that everyone understands to have been principally designed to create two majority-black districts. More simply, the socioeconomic profile of District 4 is an *effect* of District 4's design, not a *cause*.

We see, then, that the Defendants' proffer of protection of incumbent politicians and distinctive socioeconomic profiles as alternative explanations for the peculiar contours of the Plan simply do not ring true. Faced with competing inferences, this court—as fact finder—must determine the credibility of witnesses, weigh the evidence, and choose between those inferences.[49] Concluding that the facts and inferences overwhelmingly favor the Plaintiffs, we find that the Plan is undeniably a child of racial gerrymandering.[50] Defendants must therefore demon-

**47.** The Defendants also offered this evidence to argue (1) that Act 42 served a compelling state interest by enhancing the representation for poor people—especially poor black people—and (2) that the Plan adhered to the traditional redistricting principle of "commonality of interests" and thus was narrowly tailored.

**48.** An additional criticism of Mr. Lichtman's statistical legerdemain is that the socioeconomic characteristics he analyzes are themselves strongly correlated with race, a classic chicken-or-egg fallacy. At this moment in history black people in the South (and generally in America) are—on the average—poorer and less well-educated than their white counterparts. Moreover, blacks in largely segregated communities are probably poorer—on the average—than blacks in more integrated communities. Consequently, racially gerrymandered plans, which seek to draw boundaries around various concentrations of black persons, will inevitably tend to concentrate the poorer, less well-educated blacks.

The Defendants' conclusions therefore have a tautological quality: to prove that factors other

than race can explain District 4, the Defendants analyze socioeconomic factors that correlate strongly with race. Of course District 4 is relatively poor and relatively uneducated: it was intentionally filled with relatively poor and uneducated minorities. To use statistical parlance, Dr. Lichtman's conclusions are *spurious:* they tell us nothing that we could not have predicted based on the Legislature's decision to pack District 4 with black voters. For a more scientific discussion of such *spurious correlations,* see Hubert M. Blalock, Jr., *Social Statistics* 443–48 (McGraw–Hill 1972).

**49.** *Wright v. Rockefeller,* 376 U.S. 52, 57, 84 S.Ct. 603, 605, 11 L.Ed.2d 512 (1964).

**50.** In finding that racial gerrymandering exists in this case, we feel confident that we are faithfully following the Supreme Court's temper in *Shaw.* In that case, the Court gives two examples of fact patterns in which proving racial gerrymandering "will not be difficult at all." *Shaw,* 508 U.S. at ——, 113 S.Ct. at 2826, 125 L.Ed.2d at 528.

strate that Act 42 is narrowly tailored to satisfy a compelling state interest, as required by *Shaw* and other applicable Equal Protection Clause cases.[51]

## C. *Direct Proof of Racial Gerrymandering*

We need not even consider the kind of indirect or inferential proof approbated in *Shaw* to reach the same point—a finding of racial gerrymandering. In this case, we also reach that junction when we consider the great weight of the *direct* evidence elicited at both the Trial and the Evidentiary Hearing.[52] Regardless of whether we reach a finding of racial gerrymandering by the inferential approach elaborated in *Shaw,* or by direct testimony and documentary evidence, the Defendants have the burden of justifying that gerrymandering.

In this case, direct evidence clearly and forcefully demonstrates that the Plan is a product of racial gerrymandering. Virtually every witness who testified at the Trial (all without the benefit of a retrospective, self-serving view of *Shaw*) either affirmatively stated or accepted as gospel that the Plan was drawn with the *specific intent* of ensuring the creation of a second, safe, black majority congressional district: namely, District 4. The Defendants' witnesses either stated or conceded that the districts created by Act 42 were racially gerrymandered. Indeed, those witnesses, both lay and expert, spent most of their time at the Trial discussing how large the percentage of registered black voters needed to be in the new majority black district to guarantee the efficacy of their racial gerrymander—an efficacy they viewed as the *sine qua non* of preclearance.

In response to this court's query whether the Legislature had created a racial gerrymander, Defendants' counsel—Mr. Mon-

grue—said, "[a]nd [racial gerrymandering]'s exactly what [the Legislature] can do. . . ." Similarly, Mr. Willie Hunter, a black state legislator and a fact witness for the Defendants, testified that the Legislature's *intention* "was to create a district where there was an excellent possibility of having another black elected . . . , and that to accomplish this they [the legislators] "looked at numbers [of black voters] period." Professor Engstrom, an expert witness for the defense, stated unabashedly that "race drove . . . [the creation of] . . . the Districts."

Not surprisingly, the Plaintiffs' witnesses were at least equally convinced that considerations of race motivated the creation of Act 42. State Representative Adley, a white legislator from Northwest Louisiana, testified that "the only issue presented to us was a racial issue" and stated that District 4 was created "for the sole purpose of making sure that an additional black district got created regardless of what it looked like and what parishes it ran through . . ." Dr. Gary Stokley agreed that "this plan is [based on] race."

At the more recent Evidentiary Hearing, however, the Defendants attempted to recast their arguments in light of *Shaw* and to gainsay the racial gerrymandering that they so readily approbated during the pre-*Shaw* Trial. But even at this latter hearing the witnesses agreed that race was the overarching factor that drove the actual creation of the Plan, and that the Legislature had specifically intended to assort voters into districts based on race. Senator Marc Morial, a black legislator from New Orleans who appeared on behalf of the Defendants, testified that "[i]t was the intent of the Legislature to create . . . [a] . . . second majority black district." This is perhaps the clearest, most direct post-*Shaw* statement of intent, and the best illustration of the difference between

One example is when "a State concentrate[s] a dispersed minority population in a single district by disregarding traditional districting principles such as compactness, contiguity, and respect for subdivisions." *Id.* Those facts squarely conform to this case. In the instant case, the Louisiana State Legislature created a serpentine belt 600 miles long to engulf enough blacks (actually, more than enough) to create a single super-majority district. According to the Court, this case presents a textbook example of racial gerry-

mandering that can be easily proved by application of the *Shaw* inferential minuet.

51. *Shaw*, 508 U.S. at ——, 113 S.Ct. at 2826, 125 L.Ed.2d at 528; *see also supra* note 13.

52. *See Shaw*, 508 U.S. at ——, 113 S.Ct. at 2826, 125 L.Ed.2d at 528 (implying that however a racial gerrymander is established, it should receive strict scrutiny). *See also supra* note 17 and accompanying text.

*intent* and *motive.* Similarly, United States Congressman James A. Hayes (D. La) stated that the politics of race "was the major element" that drove the creation of the Fourth District. Dr. Lawrence N. Powell, one of Defendants' expert witnesses, agreed that "the primary determinant" of the shapes of Districts 2 and 4 was race.

During four full days of testimony, two in 1992 and two more in 1993, some witnesses stated that race was the only factor, while others said that race was the primary factor. One witness—apparently uncomfortable with saying race was the primary factor—admitted that race was a very important factor. Not one witness, Plaintiffs' or Defendants', testified that Act 42 was not largely a product of racial gerrymandering—not one.

Harking back to our homicide analogy, we note that although witnesses at the Evidentiary Hearing voiced various altruistic *motives*—or accused others of various ulterior *motives*—for intentionally employing racial gerrymandering to create voting districts on the basis of race,[53] everyone agreed that the *intent* of the Legislature—analyzed as a whole rather than from the point of view of its constituent members or caucuses—was to create a redistricting plan with a second majority black district.

The evidence showed that the Plan passed the Legislature by virtue of an uncommon alliance of legislators: Some who supported the Plan wanted a second super-majority black district to increase the number of black representatives in Louisiana's congressional delegation. Other supporters of the Plan perceived various benefits in the correlative whitening of some districts that attends the intentional segregation of black voters into other adjacent districts.[54] But there is absolutely no doubt that the immediate *intent* of the Legislature as a whole was to enact a plan containing two black majority districts, essentially without regard to any other considerations and interests.

Viewed in any light, the direct evidence in this case proves the presence of racial gerrymandering. Thus, even in the event that we may have somehow misconstrued the Court's opinion in *Shaw,* or misapplied the inferential minuet established therein, the *direct evidence* that Act 42 was a product of racial gerrymandering is overwhelming. Two independent evidentiary bases (inferential and direct) thus support our finding that Act 42 reflects racial gerrymandering. Each is sufficient on its own to subject Act 42 to strict scrutiny, and each is consequently sufficient to require the Defendants to demonstrate that Act 42 is "narrowly tailored to further a compelling governmental interest," as required by *Shaw* and other applicable Equal Protection Clause precedents.[55]

### D. Strict Scrutiny of the Plan

Again, the core principle underlying the Supreme Court's decision in *Shaw* is that racially gerrymandered redistricting plans are subject to the same strict scrutiny that applies to other state legislation classifying citizens on the basis of race.[56] To survive such scrutiny, racially gerrymandered redistricting plans must be narrowly tailored to further a compelling governmental interest.[57]

### 1. Compelling Governmental Interest

Defendants advance four possible compelling state interests to justify their racial gerrymandering: (1) conformity with Section 2 of the Voting Rights Act, (2) conformity with Section 5 of the Voting Rights Act, (3) proportional representation of Louisiana blacks

---

**53.** Among the positive goals thus voiced were promoting racial harmony, increasing racial fairness, eradicating vestiges of past de jure segregation, and "obeying the law" in the sense of complying with the Voting Rights Act in a way that would justify preclearance, to name a few.

**54.** Testimony at the trial revealed that Act 42 was passed by a legislative alliance between the Black and the Republican Caucuses, historically uncommon bedfellows but, according to expert testimony, a phenomenon occurring with increasing frequency across the country.

**55.** *Shaw,* 508 U.S. at ——, 113 S.Ct. at 2826, 125 L.Ed.2d at 528.

**56.** *See supra* note 13.

**57.** *Shaw,* 508 U.S. at ——, 113 S.Ct. at 2826, 125 L.Ed.2d at 528.

in Congress,[58] and (4) remedying the effects of past racial discrimination. Witnesses also made oblique references to various other admirable but nebulous—and often question-begging—motives, like promoting racial harmony and ensuring fairness. As we conclude, however, that Act 42 is not narrowly tailored to further these or any other compelling state interests, we need not decide here whether any one or more of them—properly clarified—is such an interest. For the sake of judicial economy, then, we do not analyze them in detail. Rather, we assume—without granting—that one or all of them constitutes a compelling state interest.

### 2. Narrowly Tailored

■ By thus assuming—again, without granting—that the Defendants have articulated one or more compelling state interests that the Plan might further, we have shifted the focus of our strict scrutiny to the final aspect of *Shaw:* whether the Plan is narrowly tailored. In our final illustrative comparison with homicide, we note the parallelism between the hypothetical criminal defendant's burden—*at common law*—of establishing an affirmative defense—such as justifiable homicide—and the State's burden here of establishing the affirmative justification of a compelling state interest.[59] But even such affirmative defenses contain crucial limiting

elements: the requirement of applying only reasonable force in the self-defense context, and the requirement of narrow tailoring in the compelling state interest context.

A homicide defendant, relying for acquittal on self-defense or justifiable homicide, must show not only that he had a reasonable fear of imminent harm from the aggressor/victim, but also that he used no more force than was reasonably necessary under the circumstances. If a single, deterrent gunshot to the aggressor/victim's leg happens to cause death from uncontrollable hemorrhaging, the homicide may well be justified; but if the defendant fires two or three or four additional, immediately-fatal shots into vital areas of that same aggressor/victim's body after he has been neutralized by the first shot in the leg, the defendant is likely to find that the affirmative defense is unavailing.

In close parallel, *Shaw* tells us that, even in retrogression cases under Section 5, the State does not have carte blanche to engage in racial gerrymandering; its reapportionment plan must *not* go "beyond what [is] reasonably necessary" to further the compelling governmental interest.[60] That is the essence of narrow tailoring in the redistricting context: just as a homicide defendant may not use excessive force to stop an aggressor, neither may a state burden the rights and interests of its citizens more than

**58.** At the Trial, Legislator Willie Hunter strongly advocated a second black majority district for the expressed goal of achieving black proportionality in congress. Without commenting—one way or another—on proportional representation's viability as a "compelling governmental interest," we foresee serious constitutional problems in accomplishing that goal through creation of a second black majority district. Evidence adduced here demonstrates that, of Louisiana black voting age population outside New Orleans, even the overloaded 63% black District 4 would produce the election of the [black] candidate of choice of fewer than 40% of those blacks whom the proponents of proportional representation want to be thus represented in Congress. Consequently, the Plan would constitute state action that, in effect, grants voting "proxies" *from* the black voters residing in Districts 1, 3, 5, 6 and 7 *to* the black voters of District 4—clearly a disenfranchisement implicating equal protection and possibly due process as well.

**59.** We realize that many states choose to make the absence of justification an element of the *actus reus,* thereby imposing upon the prosecu-

tion the burden of proving that the criminal defendant did *not* act in self-defense. As the Supreme Court has lately declined to review whether the Due Process Clause requires the burden of persuasion in self-defense cases to be placed on the prosecution, *see, e.g., Moran v. Ohio,* 469 U.S. 948, 105 S.Ct. 350, 83 L.Ed.2d 285 (1984) (Brennan, J., dissenting), state legislatures remain free to allocate burdens of proof "by labeling as affirmative defenses" aspects of a case that could alternatively be considered elements of a crime. *Patterson v. New York,* 432 U.S. 197, 210, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281 (1977); *see also McElroy v. Holloway,* 451 U.S. 1028, 1029–31, 101 S.Ct. 3019, 3019–21, 69 L.Ed.2d 398, 399–400 (Rehnquist, J., dissenting). For our purposes, however, such subtleties are irrelevant: as noted above, we are merely using classic common law homicide/self-defense as an instructive analogy.

**60.** *Shaw,* 508 U.S. at ——, 113 S.Ct. at 2831, 125 L.Ed.2d at 534.

is reasonably necessary to further the compelling governmental interest advanced by the state.

In this case, uncontroverted evidence from both the Trial and the Evidentiary Hearing convinces us that the Plan is not narrowly tailored to satisfy any of the supposedly compelling state interests advanced by the Defendants.[61] We reach that conclusion first because the Plan entails considerably more segregation than is necessary to satisfy the need for a second black majority district—even assuming arguendo that such a second district were itself justified—and second because the Plan excessively burdens a variety of third party interests—dramatically so.

In its *Shaw* opinion, the Supreme Court provides one example to illustrate how to apply the requirement that a racially gerrymandered plan be *narrowly tailored* to satisfy one or more compelling state interests: "A reapportionment plan would not be narrowly tailored to avoiding the goal of retrogression if the state went beyond what was reasonably necessary to avoid retrogression."[62] Thus, if providing a single majority-minority district satisfies the nonretrogression requirement imposed by Section 5 of the Voting Rights Act,[63] then a racially gerrymandered redistricting plan comprising more than one minority-majority district is not narrowly tailored to satisfy the compelling state interest of comporting with Section 5.[64] Stated more broadly, as voters have an equal protection right not to be segregated by their state legislatures or local governments into various voting districts on the basis of race, only a plan that segregates to no greater extent than is reasonably necessary to further a compelling governmental interest can survive constitutional scrutiny. The same can be said for a plan that supersaturates a majority-minority district, while concomitantly depleting adjacent majority-majority districts of minority voters.

In this case, we find that the Plan entails more constitutionally suspect segregation than necessary, and is therefore not narrowly tailored. Continuing to assume arguendo that some state interest had been identified which could justify the creation of a second black-majority district, this Plan would have to be rejected as insufficiently narrowly tailored. It packs more black voters into a District 4 than are reasonably necessary to give blacks a realistic chance to determine the outcome of elections there, providing that they exercise their right to vote. Also, the boundaries of the district violate traditional districting principles to a substantially greater extent than is reasonably necessary.

District 4 contains 63% registered black voters, significantly more than are needed to elect representatives of their choice. To greater or lesser degrees, all expert witnesses acknowledged—some only reluctantly under cross examination—that 63% black voting age population was well in excess of the percentage needed for reasonable comfort in creating a safe voting-age majority-minority district. For further confirmation that this is so we need only ask rhetorically "If 54% is sufficient in District 2, why must District 4 be supersaturated with 63% black voting age citizens?" No evidence was adduced by the Defendants to demonstrate a substantial difference between the voting patterns in the areas covered respectively by Districts 2 and 4—either in white crossover or black block

---

61. As noted above, in this section we assume—arguendo—that the State has demonstrated a compelling state interest, although, in fact, we have not so found. Neither could we on the evidence here presented. That is a judgment for the Legislature to make and the courts to review.

62. *Shaw*, 508 U.S. at ——, 113 S.Ct. at 2831, 125 L.Ed.2d at 534.

63. *Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 1364 (interpreting Section 5 as prohibiting voting-procedure changes that "lead to a retrogression in the position of racial minorities...").

64. The Court's example clearly indicates that the State of Louisiana may not justify the Plan, or any other racially gerrymandered plan with more than one black majority district, by reference to the need to comply with the Section 5 nonretrogression principle. As noted above, because Louisiana lost a seat in the United States House of Representatives, a plan with one black majority district would satisfy the Section 5 nonretrogression requirement given no more dramatic shift in the statewide ratio of white-to-black voters than is demonstrated by a comparison of the 1980 and 1990 census figures. *See supra* note 21.

voting—to rationalize the 54%–63% disparity in black voting age populations.

Although the witnesses at trial disagreed on the exact percentage of net white cross-over votes for black candidates, we find that the evidence supported an average, *net* white cross-over vote in non-judicial elections of between 10% and 25%.[65] The evidence at trial also indicated that minority voter registration is now comparable to white registration. Clearly, District 4 need not contain a black voting age population of 63% to satisfy the interest of a second district in which black officials can be readily elected. And, although it is not the province of this court in this case to establish the demographic specifications of the State's congressional redistricting plan, we find on the basis of the credible testimony and documentary evidence, that in this instance a district with a black voting age population of not more than 55%—and probably less—would have been adequate to ensure that blacks could elect a candidate of their choice, assuming they chose to exercise their franchise and assuming the candidate of their choice had more than a modicum of appeal for non-black voters.

 Additional confirmation that the Plan is not narrowly tailored lies in its excessive disregard of traditional redistricting criteria and its derogation from third-party interests. Supreme Court precedent indicates that a variety of factors, both relative and absolute, are germane to analyzing whether a government measure is narrowly tailored. These factors include (1) the necessity of the measure, (2) the efficacy of alternative race-neutral measures, (3) the availability of more narrowly tailored (less intrusive) measures, (4) the flexibility and duration of the measure, and (5) *the impact of the measure on the rights of third parties.*[66] Relevant Supreme Court jurisprudence thus suggests that—in essence—a plan is not narrowly tailored if it adversely affects more interests, if it generally wreaks more havoc, than it reasonably must to accomplish the articulated compelling state interest. We find that the Plan thus offends.

Whether under a relative or a comparative analysis, the evidence adduced at Trial and at the Evidentiary Hearing undeniably established that, even in the face of the black population's wide dispersion in Louisiana (outside New Orleans), a second black majority district could have been drawn that would have done substantially less violence to traditional redistricting principles. For example, Marc Morial stated that "[t]here were alternatives which would have created a more compact black district that were not enacted. . . ." Similarly, Congressman Hayes admitted that a more compact plan could have been enacted. Freshman United States Congressman Cleo Fields—the former state senator and incumbent congressman from new District 4, who testified for the Defendants—also acknowledged that "it would have been possible to fulfill the desire of a second [black] majority district . . . and pay more attention than this District [District 4] does to both compactness and contiguity."

Dr. Alan Lichtman—one of the Defendants' expert witnesses at the Evidentiary Hearing—likewise testified that, were he to sit down with Dr. Ronald Weber (the expert on the other side) they "could create a [second black majority] district that looked better than this one [district 4]." And Dr. Weber—the Plaintiffs' expert witness at both the trial and the evidentiary hearing—testified that a plan could be devised that would include a second black majority district, yet still be significantly more compact and comport much more closely with other traditional redistricting principles.

---

**65.** In other words, on the average—for non-judicial elections in Louisiana—black candidates will gain more votes from white cross-over voters (whites voting for black candidates) than they will lose from black cross-over voters (blacks voting for white candidates): thus, there is a positive *net* white cross-over vote. To put it another way, black voters are—again on the average—more racially coherent/conscious than white voters.

**66.** See, e.g., *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 510–511, 109 S.Ct. 706, 730–31, 102 L.Ed.2d 854 (1989); *United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987); *Fullilove v. Klutznick*, 448 U.S. 448, 510–15, 100 S.Ct. 2758, 2791–93, 65 L.Ed.2d 902 (1980).

The testimony of freshman state Senator Tom Greene at the Evidentiary Hearing was perhaps the most enlightening on this point. He stated that, with the neutral assistance of the Legislature's redistricting computer technician, he (Greene) actually created a plan that evinced greater respect for Louisiana's traditional parish boundaries than the Plan, and still included a second majority-black district. Finally, Mr. Glenn Koepp, who is the Assistant Secretary of the Senate and the technician in charge of reapportionment activity in Louisiana since 1981, testified that computer-supported mathematical modeling programs gave the State the tools to create several plans—including several with a second black district—that would respect traditional redistricting criteria to a much greater degree than does the Plan. Thus, the great weight of the credible evidence indicates that the Legislature could have developed and adopted a redistricting plan—even one with a second majority black district—that reflected greater respect for traditional redistricting criteria and that was less disruptive to the traditional political, social, economic, ethnic, geographical, and religious organization of the State. In short, substantially less extreme racially gerrymandered plans are readily available; plans without such obviously overbroad, overarching overkill.

In summary, we hold that the Plan is *not* narrowly tailored, either relatively or absolutely. This is so because it embraces considerably more racial gerrymandering—and thus more segregation—than is needed to satisfy any advanced state interest, and because the Plan unnecessarily violates a host of historically important redistricting principles, thereby adversely affecting countless third party interests. These several and varied interests—some constitutionally protected and others merely important—may not be callously sacrificed on the altar of political expediency, particularly when less broadly tailored plans are conceivable.[67]

## IV

### CONCLUSION

We find that the Plan in general and Louisiana's Congressional District 4 in particular are the products of racial gerrymandering and are *not* narrowly tailored to further any compelling governmental interest. We are therefore constrained to conclude that the Plaintiffs' right to equal protection as guaranteed by the United States Constitution is violated by the Plan. Consequently, we declare Act 42 of 1992 to be unconstitutional and the redistricting plan embodied therein to be null and void; and we enjoin the State of Louisiana from holding any future congressional elections based on the Plan. We do not, however, invalidate the 1992 congressional elections held thereunder; but we do hold that the term of office of each member of the United States House of Representatives from Louisiana who represents a district created under the Plan—and each district thus created—shall expire, *ipso facto*, at noon on the 3rd day of January, 1995, such terms of office and such districts not to be extended or carried over into the next Congress in any manner whatsoever.

---

**67.** We offer no opinion as to how much more narrowly tailored a plan would have to be to survive strict scrutiny. Indeed, we cannot say whether it is even possible—based on the 1990 Census—to devise a plan that would have two majority-minority districts and still be narrowly tailored *vel non.*

Even a plan that under the circumstances is as narrowly tailored as possible—in a *relative sense* (i.e., the least invasive and damaging plan available to further a compelling state interest)—may fail to be sufficiently narrowly tailored—on an *absolute* basis—to pass constitutional muster. For example, when the minority population is spread so evenly throughout a state that a majority-minority district cannot be drawn without dramatically impairing the constitutional rights of the citizens of that state, there may simply be no constitutionally permissible way to draw such a district, no matter how defensible the legislature's motives for wishing to do so, or how *bona fide* its efforts to tailor the plan narrowly.

## APPENDIX A

### The Seven Districts Created
### by Act 42

| District | Total Pop. | Total White | Total Black | Total Reg. Vot. | Total Reg. Wh. | Total Reg. Blk. |
|---|---|---|---|---|---|---|
| District 1 | 602,859 | 528,079 | 60,895 | 325,140 | 296,356 | 26,238 |
| | 100.00% | 87.60% | 10.10% | 100.00% | 91.15% | 8.07% |
| District 2 | 602,689 | 213,832 | 367,460 | 295,953 | 113,917 | 177,634 |
| | 100.00% | 35.48% | 60.97% | 100.00% | 38.49% | 60.02% |
| District 3 | 602,950 | 454,235 | 131,735 | 329,451 | 256,990 | 70,016 |
| | 100.00% | 75.34% | 21.85% | 100.00% | 78.01% | 21.25% |
| District 4 | 602,884 | 198,389 | 400,493 | 309,357 | 112,241 | 195,351 |
| | 100.00% | 32.91% | 66.43% | 100.00% | 36.28% | 63.15% |
| District 5 | 602,816 | 463,168 | 133,329 | 321,508 | 259,986 | 59,748 |
| | 100.00% | 76.83% | 22.12% | 100.00% | 80.86% | 18.58% |
| District 6 | 602,854 | 502,982 | 87,718 | 329,071 | 289,575 | 38,032 |
| | 100.00% | 83.43% | 14.55% | 100.00% | 88.00% | 11.56% |
| District 7 | 602,921 | 478,453 | 117,651 | 331,814 | 271,798 | 58,944 |
| | 100.00% | 79.36% | 19.51% | 100.00% | 81.91% | 17.76% |
| Total | 4,219,973 | 2,839,138 | 1,299,281 | 2,242,294 | 1,600,863 | 625,963 |
| | 100.00% | 67.28% | 30.79% | 100.00% | 71.39% | 27.92% |

APPENDIX B

WALTER, District Judge, concurring:

I concur with the result of the majority opinion. However, since my examination of the case differs somewhat analytically, I write separately.

This court considered several questions: May a State enact a race-based reapportionment plan? If so, under what circumstances are race-conscious measures allowed? Finally, how do these requirements apply to Act 42?

I

## LAW

[I]n view of the constitution, in the eye of the law, there is no superior, dominant, ruling class of citizens. There is no caste

here. Our constitution is color blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved ...

The destinies of the two races, in this country, are indissolubly linked together, and the interests of both require that the common government of all shall not permit the seeds of race hate to be planted under the sanction of law ...

The sure guaranty of the peace and security of each race is the clear, distinct, unconditional recognition by our governments, national and state, of every right that inheres in civil freedom, and of the equality before the law of all citizens of the United States, without regard to race.

*Plessy v. Ferguson,* 163 U.S. 537, 558, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896) (Harlan, dissenting).

## A

### CONSIDERATION OF RACE IN REDISTRICTING LEGISLATION

Despite the legislation enacted to promote racial equality, many states remained recalcitrant to the Civil War amendments' mandates. Among the methods used by the states to evade the fifteenth amendment were poll taxes, literacy tests, and gerrymandered [1] districts. Responding to this perversion, Congress enacted the Voting Rights Act of 1965 "as a dramatic and severe response to the situation." *Shaw v. Reno,* 508 U.S. ——, ——, 113 S.Ct. 2816, 2823, 125 L.Ed.2d 511 (1993). Amended in 1982, section 2 of

the Voting Rights Act prohibits the dilution of a minority group's voting strength while section 5 mandates pre-clearance of newly created districts for those states that employed disenfranchising schemes in the past. The purpose of the voting rights legislation is to prohibit State efforts to abridge or deny minority representation. To this end, when pre-clearance is sought under section 5, the Department of Justice usually seeks maximization of minority voting strength to promote minority representation.[2] Since legislators are thus obligated to consider racial factors when redistricting, a delicate balance arises between promotion of minority suffrage and the color-blind strictures of equal protection.

## B

### EQUAL PROTECTION

"No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amdt. 14 § 1. Interpreting this clause nearly a century ago, the Supreme Court held in *Plessy v. Ferguson,* 163 U.S. 537, 558, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896) that the separate but equal doctrine comported fully with the Fourteenth Amendment. *Id.* at 548, 16 S.Ct. at 1142. "The majority [in *Plessy* ] held that persons could be legally classified and treated in such a manner because of their race when the classifying law was a reasonable exercise of the police power. This meant that such laws must be reasonable, good faith attempts to promote the public good and not be designed to oppress a particular class." John E. Nowak, Ronald D. Rotunda, *Constitutional Law,* 618 (1991). As the Court itself stated:

[W]e think the enforced separation of the races, as applied to the internal commerce of the state, neither abridges the privileges

---

**1.** Gerrymander is "[a] name given to the process of dividing state or other territory into the authorized civil or political divisions, but with such a geographical arrangement as to accomplish an ulterior or unlawful purpose, as for instance, to secure a majority for a given political party in districts where the result would be otherwise if they were divided according to obvious natural lines." Black's Law Dictionary (5th Ed.).

**2.** It is my opinion that *Shaw v. Reno* did not fully address the constitutional or statutory authority

behind Department of Justice pre-clearance requirements that arguably go beyond the Voting Rights Act. Thus, the Supreme Court may very well hold the Department of Justice's reliance on minimum "safe" percentages unconstitutional. I do not reach that question today but am troubled by the effect that these demands are having upon states seeking administrative pre-clearance rather than a declaratory judgment from the District Court of the District of Columbia.

or immunities of the colored man, deprives him of his property without due process of law, nor denies him the equal protection of the laws, within the meaning of the fourteenth amendment.

*Plessy,* 163 U.S. at 548, 16 S.Ct. at 1142.

Fifty-eight years later, *Plessy*'s flawed concept of equal protection was rejected. Although *Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) did not expressly overrule *Plessy* outside the realm of education, that case heralded the demise of separate but equal treatment of the races by the states. Over the past four decades, the Supreme Court has confronted the consideration of race in State and federal legislation and has fashioned specific guidelines for testing the constitutionality of such considerations.

The central purpose of the Equal Protection Clause "is to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno,* 508 U.S. at ——, 113 S.Ct. at 2824. "Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to politics of racial hostility." *City of Richmond v. J.A. Croson Company,* 488 U.S. 469, 493, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989). Accordingly, the Court has "held that the Fourteenth Amendment requires state legislation that expressly distinguishes among citizens because of their race to be narrowly tailored to further a compelling governmental interest." *Shaw,* 508 U.S. at ——, 113 S.Ct. at 2825. This test is known as strict or heightened scrutiny and is justified because:

[a]bsent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed, the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.

*Croson,* 488 U.S. at 493, 109 S.Ct. at 721. These equal protection principles apply to statutes that "although race-neutral, are, on their face, 'unexplainable on grounds other than race,' " and classifications that are ostensibly neutral but are an obvious pretext for racial discrimination. *Shaw,* 508 U.S. at ——, 113 S.Ct. at 2825 (citing *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)).

Under current equal protection doctrine, "race-conscious state decisionmaking is [not] impermissible in *all* circumstances." *Shaw,* 508 U.S. at ——, 113 S.Ct. at 2824 (emphasis in original). If State legislation contains explicit racial classifications, if it is inexplicable on grounds other than race, or if it contains race-neutral classifications that serve as mere pretext for racial discrimination, then courts are bound to apply the strict scrutiny regime. The classification must be *justified* by a *compelling* state interest, and then be *narrowly tailored* to fit that interest in order to survive constitutional scrutiny.

## C

### *RACIAL GERRYMANDERING UNDER EQUAL PROTECTION*

Redistricting legislation is almost always race-neutral on its face. Before *Shaw,* the Supreme Court had

held that only two types of state voting practices could give rise to a constitutional claim. The first involves direct and outright deprivation of the right to vote, for example by means of a poll tax or literacy test ... The second type of unconstitutional practice is that which affects the political strength of various groups in violation of the Equal Protection Clause. As for this latter category, [the Court] insisted that members of the political or racial group demonstrate that the challenged action have the intent and effect of unduly

diminishing their influence on the political process.

*Shaw,* 508 U.S. at ——, 113 S.Ct. at 2834 (White, J. dissenting). The latter category, known as "dilution," arises when voters are not deprived of the right to vote, but, through methods such as "cracking," "stacking," and "packing," certain groups are denied an *effective* vote. *See, United Jewish Organizations of Williamsburgh, Inc. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) ("UJO"); *Voinovich v. Quilter,* 507 U.S. ——, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993). Acknowledging UJO and its progeny, *Shaw* went further, holding that "district lines obviously drawn for the purpose of separating voters by race require careful scrutiny under the Equal Protection Clause regardless of the motivations underlying their adoption." *Id.* 508 U.S. at ——, 113 S.Ct. at 2826.

Supporting this holding is the now famous case of *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) in which the Alabama legislature redefined the boundaries of Tuskegee, essentially excluding all but a few black citizens from the district. The result was "a strangely irregular twenty-eight-sided figure." *Id.,* at 341, 81 S.Ct. at 127. The Court found the scheme repugnant to the Fifteenth Amendment, holding:

> ... Act 140 was not an ordinary geographic redistricting measure even within familiar abuses of gerrymandering. If these allegations upon a trial remain uncontradicted or unqualified, the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration, that the legislation is solely concerned with segregating white and colored voters ...
>
> It is difficult to appreciate what stands in the way of adjudging a statute having this inevitable effect invalid in light of the principles by which this Court must judge, and uniformly has judged, statutes that, howsoever speciously defined, obviously discriminate against colored citizens.

*Id.* at 341, 342, 81 S.Ct. at 127, 127. Therefore, racial gerrymandering, or legislation that manipulates district lines to achieve a predetermined racial result is subject to strict scrutiny.

## D

### PROVING A RACIAL GERRYMANDER

"Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563. Such invidious discriminatory intent or purpose need not be the legislature's dominant or primary consideration. Rather, proof that invidious discriminatory purpose was a motivating factor in the legislation will suffice. *Id.* Because improper racial classifications rarely appear on the face of legislation, the Supreme Court has identified subjects of proper inquiry in determining whether racially discriminatory intent existed. For example, legislation that "bears more heavily on one race than another" may indicate discrimination, *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), as will historical patterns, *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977), legislative history, *Id.,* irrationality pointing to nothing but racial classification, *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), and direct evidence adduced, as in this case, before a three judge panel. *Shaw* stands for the proposition that bizarre reapportionment schemes such as that challenged in North Carolina and Act 42 fall into the *Yick Wo* category and may, in and of themselves, be evidence of invidious discrimination.

Of course, these indicators may be rebutted by evidence of wholly legitimate purposes. "The district lines may be drawn, for example, to provide for compact districts of contiguous territory, or to maintain the integrity of political subdivisions." *Shaw,* 508 U.S. at ——, 113 S.Ct. at 2826. When such legitimate purposes are disclosed and ***accepted by the court,*** heightened scrutiny is inappropriate. However, if the grounds asserted are an obvious pretext for racial discrimination or are simply *post hoc* arguments contrived to shield the segregation from judicial inquiry, the court must pursue the strict scrutiny regime.

E

## *STRICT SCRUTINY: WHEN IS A STATE INTEREST COMPELLING AND WHAT DETERMINES NARROW TAILORING?*

### 1

### COMPELLING STATE INTEREST

Few interests will be deemed "compelling" enough to justify State classifications according to race. The Supreme Court has given little indication as to what satisfies this portion of the strict scrutiny regime. However, the Court has accepted the correction of past governmental and private sector discrimination, *Richmond v. J.A. Croson*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), ethnic and racial diversification in the faculty and student bodies of state operated universities and professional schools, *see Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), and has suggested that States have a "very strong interest in complying with federal antidiscrimination laws that are constitutionally valid as interpreted and applied." *Shaw*, 508 U.S. at ——, 113 S.Ct. at 2830. Despite the language in *Bakke*, the Court seems unwilling to allow any race-based measures outside a remedial setting[3]. *Croson*, 488 U.S. at 493, 109 S.Ct. at 721.

Although the States and their subdivisions may take action to remedy discrimination, "they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief." *Croson*, 488 U.S. at 503, 109 S.Ct. at 727. That identification occurs when "judicial, legislative, or administrative findings of constitutional or statutory violations" are made. *Bakke*, 438 U.S. at 308–309, 98 S.Ct. at 2757–2758. Otherwise, "the dream of a Nation of equal citizens in a society where race is irrelevant to personal opportunity and achievement would be lost in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs." *Croson*, 488 U.S. at 504, 109 S.Ct. at 728.

### 2

### NARROWLY TAILORED

Once an interest has been properly identified and accepted as compelling, the court must examine the classification in order to determine whether it is narrowly tailored to "fit" the interest involved. In deciding whether race-conscious remedies are appropriate, the court may consider several factors. Among these are the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief; and the impact of the relief on the rights of third parties. *U.S. v. Paradise*, 480 U.S. 149, 169, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987). However, the relief must not go beyond what is reasonably necessary to accomplish the compelling interests. *See, Shaw*, 508 U.S. at ——, 113 S.Ct. at 2831.

Therefore, this court must first determine how the districts were drawn, that is, whether they were drawn along race lines or not. To do so, this Court will examine the factors listed in section D above. If the State counters with a legitimate non-racial explanation for Act 42's configuration, this Court will defer to the Legislature and refrain from reviewing the merits of their decisions. However, if a motivating factor behind the reapportionment scheme was racial, strict scrutiny applies. Then we turn to whether the State had a compelling interest supporting racial discrimination. We will expect the State to provide specific evidence warranting its action and require a nexus between the action and the interest. Finally, we will examine whether Act 42 itself was narrowly tailored to fit the compelling interest in light of the factors discussed above.

### II

### ANALYSIS

### A

### *ACT 42 IS A RACIAL GERRYMANDER*

This court found the evidence to indicate overwhelmingly that the intent of legislature

---

**3.** Compliance with federal law under the Voting Rights Act may be viewed as remedial and, therefore a state interest and perhaps compelling.

was to divide Louisiana's congressional districts along racial lines. The inferential evidence and the direct testimony of legislators for both the plaintiffs and the State allow no other conclusion. It is true that the State attempted to demonstrate non-racial explanations for the highly irregular districts. In light of the testimony at both the trial and evidentiary hearing, these suggestions are but *post hoc* rationalizations.

The evidence before the Court demonstrated that the State Legislature acted as it did to gain pre-clearance and contrived the interest of correcting past discrimination for the purpose of the evidentiary hearing alone. Finally, as the majority notes above, most witnesses readily admitted to the availability of other plans less offensive to traditional districting patterns and or smaller racial discrepancies.

## B

### *ACT 42 IS SUBJECT TO STRICT SCRUTINY*

As our factual findings denote, Act 42 is a clear example of a racial gerrymander. Specifically, District 4 permits no conclusion other than classic segregation. Both the facial irregularity without plausible non-racial explanation [4] and the explicit testimony of the legislators require this finding. Since redistricting along racial lines was a *motivating factor*, Act 42 is subject to strict scrutiny.

**4.** The defense elicited testimony that District 4 actually represents certain commonalities of interest. Essentially, the State suggested that certain interests are predominantly shared by Blacks and therefore District 4 has a sufficient non-racial justification. This is exactly the type State action that our color-blind Constitution prohibits. As the *Shaw* Court held:

"A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common but the color of their skin, bears an uncomfortable resemblance to political apartheid. It reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls. We have rejected such perceptions elsewhere as impermissible racial stereotypes. By perpetuating such notions, a racial gerryman-

This panel must now determine whether Act 42 was justified by a compelling governmental interest and that the means chosen by the State to effectuate its purpose were narrowly tailored to the achievement of that goal.

### 1

### COMPELLING INTERESTS

The State advanced two main compelling interests behind the racial gerrymander. I discussed the findings required by *Croson*, *Wygant*, and *Bakke* when a State attempts to rely on prior discrimination as a foundation for remedial action. I see no reason why the same analysis should not apply when a state argues that compliance with federal anti-discrimination law mandated the jurisdiction's race-based action. In order to rely on "remedying past discrimination" and "obeying the law," a State must "demonstrate a strong basis in evidence for its conclusion that remedial action was necessary." *Croson*, 488 U.S. at 510, 109 S.Ct. at 730. I examine each purported interest in turn to see if the State has met this burden.

### a

### Past or Present Discrimination

"Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). The Supreme Court has

der may exacerbate the very patterns of racial bloc voting that majority-minority districting is sometimes said to counteract.

The message that such districting sends to elected representatives is equally pernicious. When a district is obviously created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole. This is altogether antithetical to our system of representative democracy." *Id.* 508 U.S. at ——, 113 S.Ct. at 2827.

I agree with what I perceive to be Justice O'Connor's views. If a multi-cultural State in which voters shared interests not according to the color of their skin but the content of their lives and experiences was the Legislature's goal, the tampering would have resulted in more evenly split districts. The races would then have to reconcile their differences with one another and move forward on common ground.

firmly held that States must have "convincing evidence that remedial action is warranted." *Id.* While there is no doubt that Louisiana has a sorry history of race relations, the defense did not provide evidence that the Legislature had before it the necessary factual predicate warranting a voluntary affirmative action redistricting plan. In fact, the evidence supports the conclusion that the Legislature did not create Act 42 for the purpose of remedying past discrimination at all. Thus, if the State does intend to redistrict along racial lines with the goal of correcting past electoral discrimination, it must demonstrate what evidence warrants a finding of discrimination and how a specific plan relates to the elimination thereof.

b

### Pre-clearance from the Department of Justice

The State legislators acted under the assumption that failure to create a second majority-minority district would result in the denial of pre-clearance by the Department of Justice. This assumption seems to be founded upon the rejection of two non-congressional plans by the Department of Justice. However, both letters from the Civil Rights Division acknowledged that the plans satisfied Section 5 pre-clearance requirements but rejected the plans because they could have been drawn more effectively. The *Shaw* opinion held that a state interest in complying with federal law is compelling only as constitutionally interpreted and applied. Additionally, by pointing out the distinction between what the law *requires* and what it *permits,* the Court stated that even valid plans under the Voting Rights Act must comport with the Fourteenth Amendment. Because the Voting Rights requirements do not give covered jurisdictions *carte blanche* to engage in racial gerrymandering in the name of nonretrogression, the question for this court is whether the State of Louisiana had a strong basis in evidence for the belief that failure to create a second majority-minority district would violate Section 2 or 5 of the Voting Rights Act.

(1)

### Section 2 of the Voting Rights Act

Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 was enacted to accomplish the guarantees of the Fifteenth Amendment. Specifically, Section 2(a) prohibits the imposition of any electoral practice or procedure that "results in a denial or abridgement of the right of any citizen ... to vote on account of race or color." This section therefore rejects State actions that, "interacting with social and historical conditions, impair the ability of a protected class to elect its candidate of choice on an equal basis with other voters." *Voinovich v. Quilter,* 507 U.S. ——, ——, 113 S.Ct. 1149, 1155, 122 L.Ed.2d 500 (1993). If, under the totality of the circumstances, a State's apportionment scheme has the effect of diminishing or abridging the voting strength of a protected class, a Section 2 violation has occurred. *Id.* These "dilution" claims involve three threshold conditions.

> First, they must show that the minority group 'is sufficiently large and geographically compact to constitute a majority in a single member district.' Second, they must prove that the minority group " 'is politically cohesive.' " Third, the plaintiffs must establish 'that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.'

*Id.* 507 U.S. at ——, 113 S.Ct. at 1157 (quoting *Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986)). District 4 is evidence alone that the minority population large enough to constitute a majority in a single member district is not geographically compact. Without satisfaction of this initial *Gingles* condition, it is impossible to find that the State had a rational basis to believe that failure to create a second majority-minority district would violate Section 2. Reliance on possibly invalid applications of the Voting Rights Act by the Department of Justice cannot create a compelling state interest. If so, the Department of Justice and various States could sidestep the holdings of *Croson, Gingles,* and *Shaw* with ease.

### (2)
### *Section 5 of the Voting Rights Act*

Similar findings are required under the "nonretrogression" analysis of Section 5. If the State had no basis to believe that one majority-minority district out of seven districts would constitute retrogression, then reliance on Section 5 as a compelling interest is misplaced. "Under [the nonretrogression] principle, a proposed voting change cannot be pre-cleared if it will lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Shaw*, 508 U.S. at ——, 113 S.Ct. at 2830 (quoting *Beer v. U.S.*, 425 U.S. 130, 141, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1976)). On its face, creating one district out of seven when the previous ratio was one district out of eight is not retrogressive. Once again, the legislature appears to have founded their belief that one district out of seven is retrogressive completely on the Department of Justice's previous unrelated rulings and the assumption that a gerrymandered second district was a requisite to pre-clearance. Without restating the points made above, I find such an assumption, without additional evidence, uncompelling.

In summary, I find *post hoc* reliance on past discrimination and warrantless assertions that the Voting Rights Act mandated a second district, unpersuasive. This is not to say that the State cannot rely on those interests to justify future affirmative action. Rather, I find that the basis forwarded by the State to claim these interests as compelling is so slim that they reek of the pretextual and the contrived.

### 2
### NARROWLY TAILORED

Even if this panel were to overlook the dearth of *Croson*-type findings in this case, Act 42 cannot be termed narrowly tailored to fit the interests above. Since I concur in the majority opinion, I find no reason to reiterate their conclusions that Act 42 is not narrowly tailored to fit any compelling interest.

### III
### CONCLUSION

I am gravely disturbed by the history of racial discrimination in this country and State, but I believe that segregation of voters by race will achieve nothing but more discrimination, more separation, more animosity and would push Justice Harlan's and Dr. King's dream for this nation ever further into the future. One hundred and thirty years ago this nation endured a bloody civil war to ensure freedom and equality for all. That pledge, so dearly bought, remains elusive, but the concept that people defined only by race should receive separate representation in the legislative bodies of our government mocks the goals for which so many have suffered and died. Indeed, in my opinion, it breathes life into the discredited doctrine announced by the majority in *Plessy*, forty years after the Supreme Court administered what **should** have been its mortal wound.

The districts created under Act 42 are the creatures of a racial gerrymander. The circumstantial and direct evidence supported no other conclusion. Therefore, strict scrutiny applies to Act 42. Under that regime, the justifications offered by the State for its race-based measures were not accompanied by the requisite factual predicate. Additionally, the measures taken were not narrowly tailored to fit the interests, however baseless, advanced by the State.